[No. 22142. Department Two. June 10, 1930.]

ALLEN LUBRICATING COMPANY, *Respondent,* v. PHOENIX INDEMNITY COMPANY, *Appellant.*[1]

*Ellis & Evans,* for appellant.

*Guy E. Kelly* and *Thomas MacMahon,* for respondent.

[1]Reported in 288 Pac. 906.

FULLERTON, J.—In this action, the respondent, Allen Lubricating Company, recovered against the appellant, Phoenix Indemnity Company, upon a contract of insurance evidenced by a written policy. In the court below, the appellant defended principally on two grounds: First, that the loss for which the recovery was had was not within the terms of the contract; and, second, that there was a breach of the conditions of the contract on the part of the respondent. In this court, the arguments in its brief are confined to these questions.

The respondent is a distributor of petroleum products. Its place of business is in the city of Tacoma. The plant it uses in connection with its business is of considerable dimensions, and through it runs a public street. Assuming the street to extend north and south (its exact course seems not to be stated in the record), on its west side, near the north boundary of the plant and facing upon the street, is an office building. This building is divided into two or more rooms by a hallway, and has in it the usual office furnishings, and an office safe. The street number of the plant is placed on this building, and is given as "520 East D street." South of the office building, on the same side of the street, are other buildings, one of which is used as a garage, and another as an oil warehouse. On the east side of the street, is a pumphouse, some oil tanks, and a dock. The property on each side of the street was inclosed with boundary fences, and the oil tanks were inclosed separately by a fire wall.

There were located on the plant several time clocks, which it was the duty of the person in charge of the plant in the nighttime to "punch" at stated intervals. One of these was in the office building, near the safe, another was in the garage, another in the oil warehouse, another in the pumphouse, another on the fire

wall surrounding the tanks, and still another on the dock. The distance from the office building to the pumphouse is given as approximately two hundred feet. The distance from the office building to the other places where the time clocks are located is not stated, but it is inferable that two of them at least are farther away than the pumphouse.

At the time of the transaction giving rise to the action, the respondent kept its place of business open for the purpose of sale of its products both day and night. In the nighttime, however, there was only one person in charge of the plant. This person acted as night watchman, night salesman, and general custodian of the plant.

On the morning of August 28, 1928, one Walter D: Given was in charge of the plant. At two o'clock of that day, he started to go over the plant in the performance of his duty as night watchman. The happenings that followed he relates in this language:

"The morning of August 27 at two o'clock I punched the key in the office, locked the door, went across the street to the pump house, and just as I got to the pump house, put up my hands to unlock the door, two men jumped out from the side of the pump house and came towards me with revolvers and told me to 'stick them up.' There was a watchman at the Union Oil Company, just about one hundred feet up the street from our office, and the thought flashed through my mind that he sat in there with the telephone and so I hollered 'Help!' thinking that he might hear me and call the police. One of the fellows—they kept advancing towards me—one of the fellows struck at me with his gun. I saw it coming and I drew my head back but I got the blow over the eye, breaking my glasses. It didn't knock me down. He was going to strike again and I told him that was enough, I was satisfied. He made me lie down on my stomach and put my hands behind my back, bound my wrists, gagged me, then went through my pockets, took the flashlight, office keys

and keys to the plant, and the other fellow took the keys and the flashlight and went across the street and unlocked the office door, and then this fellow made me get up—helped me up—and took me across in through the office into the back hall there and made me lie down on my stomach again with my head headed away from the office, my feet towards the—my feet were right at the office door, the door between the hallway and the office. And then they went at the safe. . . . I heard every blow they struck, heard the combination when it dropped off onto the floor; and after they took what they wanted out of the safe they opened the petty cash drawer and took silver and bills. They didn't take anything smaller than quarters and bills out of the petty cash drawer. . . . Then one of the fellows came back and put a cord around my ankles, pulled that up and pulled my feet up and looped the cord around my wrists, which they tied behind me, wound the cord between my wrists and tied that. Then they went out. I heard them walk across the floor and heard the office door shut behind them. Then I untied myself. I was not tied very tight, there was only a loop that was pulled in a bow knot, the cord from my ankles around the wrists; couple of pulls with my thumb and finger and my feet were loose. In five minutes after the door shut I was loose and had called the police.''

On cross-examination, he further testified:

"Q. Now, all they took from you when they held you up over by the tank was your keys, wasn't it? A. Yes, sir, the light and keys. Q. One of the men went across; so far as you know, he took the keys and opened the door? A. Yes, sir. Q. And then they came back —did both of them come back and get you, or one of them? A. One of them stayed there. Q. One of them stayed and the other one took you back? A. The other one didn't come back. Q. One stayed with you? A. One stayed with me and one went across the street and opened the office. Then the one who stayed with me got me on my feet and took me across. Q. Took you into the back hall? A. Yes, sir, took me into the back hall. Q. You did not see anything that happened?

A. No, sir. Q. It was not possible for you to see from where you were? A. It was not possible for me to see. Q. Now, there was nothing taken from you but the keys? A. But the keys and the flashlight.''

The gross value of the property taken by the robbers in cash, checks and securities totaled $3,502. All of this was recovered except the sum of $637.13, the amount for which the recovery was had.

The parts of the contract of insurance pertinent to the questions involved on the appeal are the following:

''The Company hereby agrees to indemnify the assured for all loss sustained during the term of this policy:

'' (a) BY ROBBERY, occurring within the United States and Canada, of any of the property specified in agreement 16, committed by any person or persons other than the assured, an associate in interest, custodian or guard, or any other employee of the assured directly in charge of the property and (b) BY DAMAGE, to the property, premises, furniture and fixtures, if caused by such robbery or attempt thereat:

''PROVIDED, ALWAYS, that this policy shall be subject to the following agreements, together with such other agreements, if any, as may be indorsed hereon, and compliance with which shall be a condition precedent to the right of recovery hereunder.

''AGREEMENTS

''1. Certain terms as used in this policy, are defined and limited as follows:

'' (a) 'Robbery' means the felonious and forcible taking of money, securities or merchandise, (1) by violence inflicted upon the person or persons in the actual care or custody of such property at the time the act is committed; or (2) by putting such person or persons in fear of violence; or (3) by an overt felonious act committed in the presence of such person or persons and of which they are actually cognizant at the time the act is committed; or (4) from the person or direct care or custody of a custodian, who, while conveying such property is killed or rendered uncon-

scious by injuries inflicted maliciously or sustained accidentally; . . .

"(g) 'Premises' means that portion of the building specified in the schedule occupied by the assured. .

. .

"16. Subject to compliance by the assured with the precautions specified in the schedule, the limit of the company's liability under this policy is as follows:

. . .

"Item (b). On money and securities, while in the actual care and custody of a custodian outside of the premises, between the hours of 7 a. m. and 7 p. m., within the terms of this policy, up to the sum of one thousand and no-100 dollars ($1,000).

"Item (c). On money, securities and merchandise inside the premises, between the hours of 7 a. m. and 12 midnight, within the term of this policy, up to the sum of fifteen hundred and no-100 dollars ($1,500).

. . .

"18. The term of this policy is twelve months from the 31st day of March, 1928, at noon, to 31st day of March, 1929, at noon, standard time, as to both dates, at the place where this policy has been countersigned.

"SCHEDULE

"The following statements numbers 1 to 8 inclusive are hereby made a part of this policy and are warranted by the assured to be true. . . .

"2. The building occupied by the assured is located at No. 520 East 'D' street, Tacoma, Washington.

"3. That portion of the building which the assured occupies is entire, and is called 'the premises.' . . .

"5. The following precautions will always be taken by the assured to prevent loss: . . .

"(d) The number of employees who always will be on duty inside the premises, when the premises are open for business, will be at least one."

At the time of the execution of the policy, a rider was attached providing that the "hours specified in items (b and c) of agreement 16 of the undermentioned policy are changed to read 7 a. m. and 7 a. m. . . ."

The appellant's first contention is that the

crime committed was not a robbery, but a burglary, and is not thus within the terms of the policy. But whether the act committed by the offenders was or was not a burglary, we think it not material to inquire. Possibly, a conviction for the crime of burglary under the facts shown could be sustained, but the same series of acts may constitute both a burglary and a robbery, and because the acts partake of the nature of both is no reason for saying that it is the one rather than the other. In this instance, the policy itself defines what acts shall constitute a robbery, and the real inquiry is, do the acts shown to have been committed fall within the definition. By the policy, it will be noted, it is provided that robbery means the felonious and forcible taking of money, securities or merchandise by violence inflicted upon the person in the actual care or custody of such property at the time the act is committed, or by putting such person in fear of violence, or by an overt felonious act committed in the presence of such person and of which they are actually cognizant at the time the act is committed.

All of these conditions were here present. There was an act of violence inflicted upon the person in the actual care and custody of the property at the time the act was committed, there was a putting of the person in fear of violence, and there was an overt felonious act committed in his presence of which he was at the time actually cognizant. The several acts committed by the wrongdoers, it is true, did not all occur in a single instant of time or at the same place, but they followed each other in regular sequence sufficiently close in time as to make the several transactions a single act. We have no hesitancy therefore in saying that the acts committed constituted a robbery within the definition of that term as given in the policy.

The second of the contentions is that there was a breach of the warranties contained in the policy. This contention involves the meaning of certain clauses of the contract of insurance. By reference to subdivision (9) under the head, ''Agreements,'' it will be observed that the policy provides that the term ''Premises'' means that portion of the building specified in the schedule occupied by the assured. By subdivision 16 under the same heading, it is provided that, subject to the compliance by the assured with the precautions specified in the schedule, the insurance covers, ''money, securities and merchandise, inside the premises.'' Under the heading ''Schedule,'' it is recited that the ''portion of the building which the assured occupies is entire, and is called the premises.'' By subdivision 5, Item (c) of the schedule, it is provided that the number of employees who always will be on duty ''inside the premises,'' when the premises are open for business, shall be at least one. From the recital made of the facts, it will be observed that the respondent's plant was open for business on the night of the robbery, and was in charge of but one person at that time; that, shortly prior to the robbery, this person locked the door of the office building from which the property was stolen, and went to another part of the plant, where he was assaulted and detained by the robbers; that the keys to the office building were taken from his possession at the place he was assaulted, and that he was taken back to the office building after one of the robbers had entered it by use of the keys.

The appellant contends that the coverage of the policy does not extend to the entire plant of the respondent, but is limited to the office building on which the street number was posted, and argues therefrom that, since the person in charge of the plant locked the doors of the building and went to another part of

the plant, there was no one "inside the premises" at the time the building was entered by the robbers, and that this constitutes a breach of the conditions of the policy.

But in our opinion the appellant puts too narrow a construction on the terms of the policy. The plant of the respondent, notwithstanding it covered a considerable area, was single and entire, and was used by the respondent as such in the transaction of its business. The street number was but a general designation of the place on the street at which the plant could be found, and the accidental circumstance that it was posted on the office building did not have the effect of limiting the description of the plant to that particular place. In other words, the description would have been just as accurate had it been posted on some other building on the premises, or had it been posted at some place on the surrounding fence where there was no building at all, and manifestly, had the latter been the fact, the appellant could not justly claim that the policy was a nullity, or that it covered no property of the respondent. True, the policy described the place as a building, but this was in the printed part of the policy. It was a part of its general form of policy. It was a term used by it to meet any and all situations, and was not specially written to meet the exigencies of the particular situation. Being its general form, it must be interpreted generally, else it will prove a means for misleading the assured, and a means for the perpetration of fraud.

Moreover, there is no showing in the record that the appellant was ignorant of the situation at the time it issued its policy, and it is not to be presumed that it was thus ignorant. Knowing this, and knowing the character and the extent of the business the respondent conducted, it knew that the respondent did not

keep or store the products in which it dealt in its office building, yet the policy covers the loss of merchandise, as well as the loss of money and securities. "Merchandise" is a comprehensive term, having a wide and extended meaning, and, when not otherwise limited, includes commercial commodities in general, be its nature what it may. There is no question in this instance but that the products in which the respondent deals are within the general designation of the term "merchandise." It follows that, if the interpretation of the terms of the policy the appellant now gives to it be correct, it did not insure any merchandise of the respondent, and knew at the time that it did not so insure it, although it exacted a premium for the purported insurance. There is, it is true, no loss of merchandise here involved, but the fact that it insured merchandise is strongly persuasive that it did not then interpret its policy as it now interprets it.

Our conclusion is that the person in charge of the respondent's property was, at the time of the robbery, "inside the premises" within the meaning of that phrase as it is used in the policy, and that there was no breach of its condition on the part of the respondent.

The appellant in its brief has assigned a number of other errors, some of which suggest in another form the questions already discussed. Others relate to trial errors, which, if well taken, would require a new trial, but, as the appellant does not argue them in its brief, it is sufficient to say our examination of them discloses no cause for reversal.

The judgment is affirmed.

MITCHELL, C. J., MAIN, FRENCH, and HOLCOMB, JJ., concur.